UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
-------------------------------------------------------x
SECURITIES & EXCHANGE                    :
COMMISSION                               :      Case No. _____
              Plaintiff,   :
v.                                       :
                                         :
TIMOTHY M. ROBERTS, TERRANCE F.  :
TAYLOR, and CRAIG CONSTANTINOU,  :
                                         :
             Defendants.  :
-------------------------------------------------------x

## COMPLAINT

Plaintiff the United States Securities and Exchange Commission (the "Commission") alleges:

### NATURE OF THE ACTION

1.    From approximately November 2010 through April 2012, Savtira Corporation ("Savtira" or the "Company"), while being led by recidivist securities law violator, Defendant Timothy M. Roberts, and his right-hand man, Defendant Terrance F. Taylor, fraudulently offered and sold more than $2.5 million of the Company's securities to over 70 unwitting investors. Defendants Roberts and Taylor used Defendant Craig Constantinou to offer and sell Savtira's securities, which he did by making misrepresentations and omissions of material facts in his sales pitches to unsophisticated and unaccredited investors less than one month before Savtira filed bankruptcy.   In addition to committing fraud, Defendants Roberts, Taylor, and Constantinou, (collectively, the "Defendants"), sold unregistered shares of Savtira's stock.

2.    Savtira, now-defunct, was presented to investors as a promising technology start-up company, led by experienced and successful officers, which was developing an innovative new product.  Defendants told investors that Savtira was on the brink of launching this new

product, an electronic commerce platform, which would purportedly generate more than $100 million in revenues by the end of 2012, and gave investors valuations projecting that the company could be worth a billion dollars by 2016.  Constantinou went even further, promising unsophisticated and unaccredited investors that their supposedly risk-free investments would generate outlandish returns equating to 1,500% to 4,000% on an annualized basis.

3.     In reality, Savtira was insolvent for most of its existence.   The Company repeatedly failed to deliver a completed, working product to its clients; the valuation was fraudulently obtained; by no later than June 2011 it was in default to multiple creditors; and it earned only a fraction of the revenues it projected.  Nevertheless, Defendants offered and sold securities to investors based on ever-inflating projections of Savtira's future revenues and value, without disclosing the company's extreme financial distress or its lack of a completed product.

4.     As a result of the conduct alleged in this Complaint, Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act").   Roberts also is liable as a control person under Section 20(a) of the Exchange Act for Savtira's violations of the Exchange Act.  Unless enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

5.     Through this action, the Commission seeks for the Court to permanently enjoin the Defendants from further violating the securities laws, impose civil money penalties, order the Defendants to disgorge their ill-gotten gains, and bar Roberts and Taylor from serving as an officer or director of a public company.

## **DEFENDANTS**

6.     Defendant Roberts is a resident of Chesterfield, Missouri.  At all relevant times, Roberts controlled Savtira.  He served as its President, Chairman, and Chief Executive Officer ("CEO"); held or controlled the voting rights of a majority of Savtira's outstanding shares of common stock; and was involved in all aspects of Savtira's operations, including the marketing of its securities.

7.     Roberts previously was the subject of a May 2006 enforcement action brought by the Commission in connection with Roberts' role as CEO of publicly-traded Infinium Labs, Inc. ("Infinium Labs Enforcement Action").  The Commission alleged that Roberts hired a promoter to send faxes to tens of thousands of potential investors regarding Infinium Labs' stock.  The faxes made it appear that Infinium Labs was on the verge of launching its flagship product, a home videogame system, when in fact the company lacked the financial resources to bring the product to market.  The Commission further alleged that Roberts took advantage of increased trading volumes to sell his own shares in Infinium Labs and that he improperly paid the promoter with four million of his own shares in the company.  In September 2008, without admitting or denying the Commission's allegations, Roberts agreed to resolve the Infinium Labs Enforcement Action by agreeing to: (a) pay a $30,000 civil penalty; (b) a five year officer and director bar; (c) a five year penny stock bar; and (d) a permanent injunction enjoining him from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, and Sections 10(b) and 16(a) and Rules 10b-5 and 16a-3 of the Exchange Act.

8.     After Savtira filed for bankruptcy, Roberts became the CEO of StationDigital Corporation ("StationDigital"), which became a public company on or about April 23, 2014.  He

resigned as CEO on or about June 13, 2014.  Roberts currently is the CEO of HashingSpace Corporation ("HashingSpace"), which became a public company on or about July 10, 2015.

9.      Defendant Taylor is a resident of Fort Myers, Florida or North Fort Myers, Florida.  At all relevant times, Taylor was the Treasurer of Savtira.  In addition, during portions of the relevant time period, Taylor was the Chief Financial Officer ("CFO") of Savtira.  Roberts and Taylor worked together to prepare Savtira's revenue projections and Savtira's financial disclosures to potential investors.

10.     After Savtira filed for bankruptcy, Taylor became the CFO of StationDigital.  He resigned as Chief Financial Officer on or about September 2, 2014.  Taylor currently is the CFO of HashingSpace.

11.     Defendant Constantinou is a resident of Tampa, Florida.  Constantinou was an early investor in Savtira.  After Savtira defaulted on a debt owed to Constantinou, he began offering and selling Savtira securities.

<h3 style="text-align:center"><b><u>JURISIDICTION AND VENUE</u></b></h3>

12.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

13.     The Court has personal jurisdiction over the Defendants, and venue is proper in the Middle District of Florida, because many of the Defendants' acts and transactions constituting violations of the Securities Act and Exchange Act occurred in Tampa, Florida.  In addition, Savtira's principal place of business was in Tampa, and Defendants Taylor and Constantinou reside in the Middle District of Florida.

14.    In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## FACTUAL ALLEGATIONS

### I.    Savtira's Organization and Business Plan

15.    Savtira was incorporated on or around November 29, 2010.  That same day, Roberts was named its President, Chairman, and Chief Executive Officer.  He also received 26,350 of Savtira's 100,000 authorized shares of common stock, making him Savtira's largest shareholder.   In addition, Savtira's employees who received shares of common stock as compensation executed "Proxy and First Refusal Agreements" giving voting control of their shares to Roberts. By July 2011, Roberts owned or controlled a majority of Savtira's authorized shares and more than 85% of Savtira's outstanding shares.

16.    Savtira's principal product was an electronic commerce platform that third-party merchants could use to market both physical and digital goods to their customers.  Savtira intended to tailor this platform to its clients' needs by building "custom stores" for each of them. The platform was intended to generate three types of revenue: one-time "development fees" for building custom stores, commissions on any goods that its clients actually sold, and fees for "streaming" music and other media from Savtira's servers to computers and mobile devices used by its clients' customers.

17.    Savtira never was able to deliver a fully functional custom store to any of its clients.  Nor was it able to provide a "Proof of Concept"—that is, a functional example of a custom store—to potential clients.  These failures directly affected Savtira's ability to earn

revenues. Because it was unable to deliver fully functional custom stores to clients, Savtira did not earn the recurring transaction-based revenue that it projected. And because Savtira could not provide a Proof of Concept, few potential clients were willing to sign contracts or pay development fees. Savtira signed only 13 contracts with clients in 2011, and some of these contracts were with start-up companies that lacked sufficient funds to pay the development fees that they owed to Savtira.

## II.    Savtira's Financial Condition

18.    Throughout its existence, Savtira was unable to generate revenues or to attract capital sufficient to cover its operating expenses. As a result, Savtira was insolvent and in default on multiple obligations starting no later than June 2011. Savtira's repeated defaults and foreclosure efforts by at least one secured creditor caused Savtira to file for bankruptcy in April 2012.

19.    Savtira's revenues were negligible compared with its operating expenses. Savtira's unaudited financial statements for the period ending December 31, 2011 reported that Savtira recognized revenue of $173,326 in 2011. During the same time period, it incurred expenses of over $10 million. Savtira was unable to resolve this large shortfall by selling securities.

20.    Savtira's undercapitalization resulted in Savtira repeatedly incurring obligations and then defaulting on those obligations. For example, by the end of July 2011, Savtira owed approximately $700,000 in past-due employee salaries and more than $400,000 in past-due debts to other creditors. Savtira attempted to address its cash shortages by factoring receivables and incurring large equipment leases in exchange for cash "rebates." Each rebate transaction allowed Savtira to pay a portion of its obligations, but simultaneously increased its ongoing payment

obligations.  In the absence of revenues sufficient to support these obligations, Savtira became more deeply indebted with each passing month.

21.     Savtira became balance sheet insolvent no later than June 2011.  Savtira's balance sheet for the month ending June 30, 2011 showed total assets of $3,302,736 and total liabilities of $4,694,744.

22.     By the first quarter of 2012, Savtira no longer had sufficient cash to pay its employees' salaries, and it became subject to an investigation by the U.S. Department of Labor concerning its repeated failures to pay employees.  These failures led to multiple employees leaving the company.  By the middle of April 2012, Savtira was forced by the Department of Labor to send its few remaining employees home.

23.     Around the same time that Savtira sent home its remaining employees, Savtira's creditors began to take action based on its repeated defaults.  On or around April 13, 2012, one of Savtira's principal equipment lessors accelerated all amounts due under Savtira's equipment leases.  On or around April 26, 2012, the lessor caused a writ of replevin to be served on Savtira, seeking the return of its equipment.

24.     Savtira filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code the next day.

25.     On or around July 26, 2012, the United States Bankruptcy Court for the Middle District of Florida granted a motion to convert Savtira's Chapter 11 case to a Chapter 7 case, based on the Court's conclusion that Savtira could not be successfully reorganized in a Chapter 11 proceeding.

26.     Against the backdrop of Savtira's deepening financial distress, Roberts, Taylor, and Constantinou offered and sold Savtira securities, painting rosy pictures of Savtira's prospects.

**II.     Offers and Sales of Savtira Securities**

27.     Two types of Savtira securities were offered and sold to the public:  common stock and convertible notes.  No registration statement was filed or in effect with respect to an offering of either type of security.  In addition, the offering and sale of Savtira's common stock was not eligible for any exemption from registration, and all the shares were offered as part of the same offering.

28.     The first shares of Savtira's common stock were sold on November 29, 2010—the day Savtira was incorporated.  As of August 31, 2011, Savtira had sold more than $1.5 million of its common stock.  This offering continued until at least April of 2012.  Offers and sales of Savtira's stock were made throughout this time period, without any breaks of six months or more.  Investors paid cash for their shares, and the cash was used to fund the general operations of Savtira and to benefit the Defendants.

29.     At least 400 shares of common stock were offered and sold to unaccredited, unsophisticated investors as part of this offering.  In or around April 2012, a resident of California and a resident of Nevada—neither of whom had a net worth of over $1,000,000 or earned more than $200,000 per year—each purchased 200 shares of common stock.  One was a photographer who had limited investing experience and the other was a young woman who had just received an inheritance and had no investing experience whatsoever.  Neither of the unaccredited, unsophisticated investors was given an audited balance sheet for Savtira, and

neither was provided with a written description of material written information that had previously been provided to accredited investors.

30.     Roberts and Taylor jointly offered and sold shares of common stock as part of this offering.  For example, in or around June 2011, Roberts and Taylor offered and sold 1,087 shares, for consideration of $100,000, to a Florida resident.  Constantinou also offered and sold shares of common stock as part of this offering, including the offers and sales to the unaccredited, unsophisticated investors described above in paragraph 29.  Each of these offers and sales was unlawful because the offering was not entitled to any exemption from registration.

31.     Roberts and Taylor also offered and sold promissory notes that were convertible into shares of Savtira common stock.  For example, in or around November 2011, Roberts and Taylor sold a $750,000 note that could be converted into common stock at a price of $93.75 per share at the option of either the holder or Savtira.

### III.     Misrepresentations in Savtira's Marketing Materials

32.     Savtira produced an "Investment Overview" brochure that was given to potential investors in Savtira securities.  Roberts had the ultimate authority to approve the contents of the Investment Overview.  However, Roberts and Taylor worked together to prepare sections relating to Savtira's financial condition and its revenue projections.  The Investment Overview contained multiple misrepresentations and omissions of material facts.

33.     The Investment Overview highlighted certain positive aspects of Roberts' background, such as his "two decades of experience in the technology industry" and his "numerous roles as CEO, CTO, Managing Director and Board member for six different companies."  The brochure also represented that two of these companies were later acquired for more than a billion dollars.  These representations were misleading and omitted information

because Roberts failed to disclose material negative aspects of his background.  Specifically, Roberts failed to disclose that he had been the subject of the Infinium Labs Enforcement Action and that he was subject to multiple injunctions as a result of the settlement of that action, including injunctions barring him from acting as an officer or director of a public company and from participating in a penny stock offering.

34.     Roberts knew, or was severely reckless in not knowing, that he had been the subject of the Infinium Labs Enforcement Action and the terms on which he settled it, but he omitted to tell these facts to investors.

35.     The Investment Overview also falsely represented that Savtira's technology was patented.  It stated that Savtira had "five patented technologies and processes for optimizing the delivery of streamed applications, caching optimization, automated processing and publication of content, could-based personal video recorder and methods for managing dynamic storefronts."  It also stated that "[Savtira's] proprietary technology is protected by patents related to the core technology, the concepts and details of devices for implementing the concept, methods of implementation, and a variety of tools and peripheral developments associated with Savtira's technology and methods."  These statements were false and misleading because Savtira never successfully obtained a single patent.  To the contrary, Savtira did not file non-provisional patent applications until February 2012, and it never responded to a March 12, 2012 "Notice to File Missing Parts of Nonprovisional Application" from the United States Patent and Trademark Office.

36.     Roberts was named as an inventor on Savtira's patent applications.  Roberts' involvement in the patent application process meant he knew, or was severely reckless in not knowing, that Savtira had not yet obtained patents, but he misrepresented this fact to investors.

37.    The Investment Overview also falsely represented the nature of Savtira's relationship with certain high-profile technology companies.  For example, the Investment Overview stated that Savtira had "partnered" with IBM and Dell.  This was false and misleading because Savtira had merely acquired software from IBM and equipment from Dell.  Although IBM has a "PartnerWorld" program and has entered into "Business Partner Agreements" with persons authorized to sell IBM products, Savtira never was a member of the PartnerWorld program and never entered into a Business Partner Agreement with IBM.

38.    Roberts participated in negotiations with both IBM and Dell, and Roberts was quoted in at least one press release issued by Savtira regarding Savtira's relationship with IBM. Roberts thus knew, or was severely reckless in not knowing, the true nature of Savtira's relationship with IBM and Dell, but he misrepresented this fact to make Savtira securities more appealing to potential investors.

39.    The Investment Overview also contained misstatements and omissions relating to Savtira's financial condition.  It projected revenues of $47.5 million in 2012 and earnings before interest, taxes, depreciation and amortization ("EBITDA") of $18.9 million.  This was false and misleading because Roberts and Taylor had no basis for believing these estimates and because the Investment Overview omitted facts necessary to understand these estimates.  First, these estimates were speculation because Savtira had no track record of earning transaction-based revenues.  Second, Savtira had not delivered a functional custom store to any of its clients and thus did not yet have the ability to earn transaction-based revenues.  Third, Savtira had failed to collect development fees from several of its clients, either because they refused to pay or because they lacked the money to pay.  Fourth, major potential clients that had been targeted by Savtira refused to negotiate a deal with Savtira because Savtira could not deliver a proof of concept.

Fifth, Savtira had missed its revenue projections throughout 2011, yet was simultaneously raising its revenue projections. Sixth, Savtira was insolvent and had defaulted on debts to multiple creditors, creating a substantial risk that the Company would be forced into bankruptcy before it could earn the revenues it projected.

40.     Roberts and Taylor regularly participated in meetings regarding Savtira's cash flows and thus knew that Savtira was not earning any transaction-based revenues or collecting development fee revenues from certain of its clients. Moreover, Roberts oversaw development of Savtira's product, and it was commonly known at Savtira that the Company had not yet delivered a working custom store. Roberts and Taylor thus knew, or were severely reckless in not knowing, that Savtira was not earning a sufficient amount of transaction-based revenues.

41.     Roberts also participated in, or was updated on the status of, negotiations with potential clients. When an Executive Vice President in the marketing department told Roberts that his revenue estimates were unrealistic and unachievable, he responded by firing her.

42.     Roberts and Taylor also participated in meetings regarding Savtira's past-due bills, and they received copies of Savtira's balance sheets. They, therefore, knew, or were severely reckless in not knowing, that Savtira was insolvent and in default to multiple creditors. Roberts and Taylor misrepresented Savtira's financial condition and omitted facts regarding its financial problems to make Savtira securities more appealing to potential investors.

43.     The Investment Overview was distributed to potential investors and used to induce them to purchase Savtira securities. Multiple investors who received the Investment Overview purchased Savtira securities.

44.     In addition to the Investment Overview, certain investors were given a chart titled "Gross Transaction Revenue" projecting that Savtira would earn revenues of approximately $103

million in 2012 and $119 million in 2013.  This was false and misleading for same reasons set forth above in paragraphs 39-42.

45.    Roberts and Taylor jointly prepared the Gross Transaction Revenue chart. They did so with the intention of deceiving investors regarding Savtira's potential revenues to make Savtira securities more appealing to potential investors.  This is demonstrated by the same facts that are alleged above in paragraphs 39-42.

## IV.    The Valuation of Savtira

46.    Roberts and Taylor engaged in a series of manipulative and deceptive acts and transactions for the purpose of obtaining a false and misleading valuation of Savtira.  The resulting valuation was then given to potential investors to induce them to purchase Savtira securities.

47.    Roberts and Taylor retained an Atlanta-based financial institution to market Savtira securities (the "Investment Bank").  In connection with this engagement, in December 2011, the Investment Bank prepared a valuation of Savtira to assist Savtira's management in pricing the securities that would be sold.

48.    The Investment Bank used three valuation methods:   a comparable public company analysis; comparable mergers and acquisitions analysis; and a discounted cash flow analysis.  All three methods involve two basic elements.  First, the Investment Bank discerned appropriate "multiples."  A multiple is the ratio of a company's market value to some underlying financial metric, such as EBITDA.  Second, the Investment Bank applied the multiple to financial metrics provided to it by Roberts and Taylor.

49.    The Investment Bank never intended for its valuation to be provided to the public; instead, the valuation was intended to be used internally by Savtira's management.   The

Investment Bank assumed that the financial metrics provided by Savtira's management were accurate. Roberts and Taylor never told the Investment Bank that they intended to provide the valuation to investors in order to sell Savtira securities.

50.      Rather than providing the Investment Bank with accurate financial metrics, Roberts and Taylor provided the Investment Bank with the same false and misleading revenue projections that they provided to potential investors. Roberts and Taylor did so because they knew, or were severely reckless in not knowing, that the Investment Bank would simply apply the multiples it discerned to the numbers they provided—meaning that every extra dollar of projected revenue would raise Savtira's projected value by several dollars.

51.      On or around December 19, 2011, Savtira's Chief Financial Officer sent Roberts an estimate of Savtira's cash position for first half of 2012, and he spoke with Savtira's General Counsel about the possibility that Savtira might be forced into bankruptcy proceedings. Roberts fired the Chief Financial Officer that evening, and he did not convey any of this information to the Investment Bank. Two days later, on December 21, 2011, a member of Savtira's board of directors sent an email to Roberts and Taylor warning that "[i]f we have a large number of unpaid creditors, and any employees that are unpaid, we could be pushed into insolvency unexpectedly." This information also was not conveyed to the Investment Bank.

52.      On December 22, 2011, the Investment Bank provided Savtira with a preliminary valuation. Using the comparable public company method and the comparable mergers and acquisitions method, the Investment Bank valued Savtira at $450 million to $540 million, based on the revenue estimates that Roberts and Taylor provided for 2012. Using a discounted cash flow analysis, the Investment Bank valued Savtira at just over $1 billion, based on the estimates provided by Roberts and Taylor for 2016.

53.     Almost immediately after the Investment Bank sent the preliminary valuation to Savtira, Roberts and Taylor began distributing it to third parties, including potential investors. Roberts and Taylor never told the Investment Bank that they were using its name and work product in this unintended manner, in violation of Savtira's contractual obligation to inform the Investment Bank of all discussions between Savtira and potential investors.

54.     The valuation prepared by the Investment Bank was false and misleading because it was predicated on false and misleading revenue projections, over which Roberts and Taylor had ultimate control.  Moreover, it was not accompanied by any disclosures relating to Savtira's insolvency, its multiple defaults on its payment obligations, the risk that it could be forced into a bankruptcy proceeding at any time, or the risk that stockholders would receive nothing in such a proceeding.  Furthermore, the projections prepared by Roberts and Taylor lacked any reasonable basis, so they knew, or were severely reckless in not knowing, that they did not genuinely or reasonably believe them.

55.     Roberts and Taylor engaged in this scheme to obtain a misleading valuation, and then provided it to investors, to deceive investors about the value of Savtira.  They knew, or were severely reckless in not knowing, that the valuation was predicated on false and misleading revenue estimates.  They also knew, or were severely reckless in not knowing, about Savtira's extreme financial problems and the attendant risk that unpaid creditors could force the Company into bankruptcy.

## V.     Roberts' and Taylor's Marketing of Savtira Securities

56.     When Roberts and Taylor met with potential investors to offer or sell securities, they echoed the misrepresentations in Savtira's written marketing materials.

57.     In late October of 2011, Roberts and Taylor had a series of meetings and phone calls with a father and son who were interested in jointly investing in Savtira. Roberts and Taylor provided them with the Investment Overview and a chart showing Savtira's projected revenues. They also made oral representations regarding Savtira.

58.     Roberts told these investors that Savtira had a completed product that was ready to launch. This was false and misleading because Savtira's software was incomplete and Savtira had not delivered a custom store to any of its clients. Roberts knew, or was severely reckless in not knowing, this because he was the ultimate supervisor of Savtira's software development efforts, and he participated in discussions with Savtira's clients. Roberts also falsely told these two investors that Savtira's technology was patented.

59.     Furthermore, Roberts and Taylor also made a joint presentation to these two investors that falsely portrayed Savtira's true financial condition.

60.     Based on Roberts' and Taylor's oral and written representations, on November 4, 2011, the father and son (together with a third investor) jointly purchased a $750,000 note that was convertible into common stock at the option of either the holder or Savtira.

## VI.     Constantinou's Marketing of Savtira Stock

61.     Constantinou was an early investor in Savtira. In or around May 2011, he purchased $200,000 of common stock. He also was a creditor of Savtira. On or around July 5, 2011, he caused a company that he owns, RAO Entertainment, Inc. ("RAO"), to wire $100,000 to Savtira in exchange for a promissory note, which obligated Savtira to pay Constantinou $110,000 in 30 days (the "July 4 Note"). Savtira defaulted on the July 4 Note.

62.     After Savtira defaulted on the July 4 Note, Constantinou offered and sold Savtira stock to at least three investors, in each case intentionally misstating and omitting material facts—particularly with respect to the potential risks and returns of investing in Savtira stock.

63.     In late August or early September of 2011, Constantinou contacted a retired investor by telephone. He told her that Savtira would be sold for billions of dollars and that she was guaranteed to receive a return, within a year, of $1.5 million for every $100,000 she invested. When she told Constantinou that she was concerned about the safety of the investment because she was caring for a disabled daughter, he told her that she could not lose money on the investment. These representations were false and misleading in light of Savtira's lack of revenues, its lack of assets, and its numerous defaults on its payment obligations, none of which were disclosed to the retired investor. Nor did Constantinou disclose any risks that might be associated with an investment in Savtira, despite knowing that Savtira had defaulted on the July 4 Note.

64.     Based on Constantinou's representations, the retired investor purchased 300 shares for $150,000 on or around September 12, 2011. Around the same time that this retired investor agreed to purchase Savtira stock, Savtira began making payments to RAO. Savtira wired payments of $5,000 on September 9, 2011; $30,000 on September 12; and $5,000 on October 7, 2011.

65.     In or around November 2011, Constantinou entered into a "Settlement Agreement" with Savtira to resolve its unpaid obligations under the promissory note. The Settlement Agreement called for Savtira to pay Constantinou $20,000. Savtira was required to pay Constantinou 10% of any money it raised in debt or equity sales or to pay the full amount by

March 31, 2012, whichever came first.  Savtira also defaulted on its payment obligations under the Settlement Agreement.

66.     In or around the beginning of March 2012, Constantinou again approached the retired investor who had purchased Savtira stock in September 2011.  He told her that Savtira would receive an investment of between $5 million and $7 million within two weeks, but that it needed funds to cover a payroll payment before that money arrived.  In fact, no such investment was ever made.  Constantinou guaranteed that if she invested another $100,000, her total investment of $250,000 would be worth $4 million within nine months.  These representations were false and misleading in light of Savtira's lack of revenues, its lack of assets, and its numerous defaults on its payment obligations, none of which were disclosed to the retired investor.  Nor did Constantinou disclose any risks that might be associated with an investment in Savtira, despite knowing of Savtira's defaults on its obligations to him.

67.     Before the retired investor agreed to invest additional funds in Savtira, she was issued 200 additional shares of Savtira in a certificate dated March 12, 2012.  On the same day that she received the certificate, she called Constantinou.  He reiterated that Savtira was on the brink of receiving a major investment and that a $250,000 investment would be worth $4 million within nine months, but again did not disclose any risks.  He also told the retired investor that another 100 Savtira shares would be issued to her if she wired Savtira $100,000.  She agreed to do so and wired the money on or around March 15, 2012.  The additional 100 shares were issued to her in a stock certificate dated March 30, 2012.  On or around March 23, 2012—roughly one week after the retired investor wired her funds to Savtira—Constantinou received a payment of $2,000 from Savtira.

68.     On or around March 14, 2012, Roberts sent Constantinou an email asking for more help raising money.  Roberts stated that it "[w]ould not be good" to start an event for potential investors with "yet another missed payroll and being 2 in arrears."

69.     Beginning at or around the time of Roberts' March 14 email, Constantinou offered and sold Savtira stock to another investor, a photographer from California.  The photographer was an unaccredited and unsophisticated investor.

70.     On or around March 30, 2012, Constantinou forwarded an email to the photographer, attached to which were copies of the Investment Overview, the Investment Bank's valuation, and the Gross Transaction Revenue chart.  At around the same time, Constantinou began calling the photographer to pitch an investment in Savtira.  For example, on April 2, 2012, Constantinou sent him a Twitter messaging asking the photographer to call him because Constantinou had gotten the photographer a "sick deal."

71.     In these telephone calls, Constantinou told the photographer that he could invest in Savtira if he wired $25,000 to Savtira and made a $5,000 loan to Constantinou.  Constantinou told him that the investment would be worth a million dollars or more in about a year.  Constantinou also told the photographer that Savtira owned its office building in Tampa and that it had so many assets that the company could afford to fully pay back stock purchasers even if it went bankrupt.  These representations were false and misleading in light of Savtira's lack of revenues, its lack of assets (including a lack of any ownership interest in its office building), and its numerous defaults on its payment obligations, none of which were disclosed to the photographer.  Nor did Constantinou disclose any risks that might be associated with an investment in Savtira, despite knowing of Savtira's defaults on the July 4 Note and its payroll obligations.

72.     Based on Constantinou's representations and written materials he sent, the photographer purchased Savtira stock.  On or around April 4, 2012, the photographer wired $25,000 to Savtira and $5,000 to Constantinou.  The photographer was issued 200 shares of Savtira stock on the same day.

73.     In addition to selling stock to the photographer, Constantinou sought the photographer's help in finding additional investors.  When Constantinou first approached the photographer, he falsely told him that the minimum investment was $100,000, but that the photographer could invest less if his friends also invested.  In fact, Savtira's Form D reported that it was accepting investments as small as $25,000.  Based on Constantinou's misrepresentation, the photographer introduced Constantinou to an unaccredited, unsophisticated investor—a woman in her early twenties who had just received an inheritance of approximately $100,000, which was the first money that she ever had to invest.  The photographer also forwarded to her Constantinou's email attaching Savtira's marketing materials.

74.     In the second half of March of 2012, Constantinou called this inexperienced investor and told her that an investment of $50,000 would result in her having $1 million in the bank within a year.  He did not disclose any risks associated with investing in Savtira.  These representations were false and misleading in light of Savtira's lack of revenues, its lack of assets, and its numerous defaults on its payment obligations, none of which were disclosed to the inexperience investor.  Nor did Constantinou disclose any risks that might be associated with an investment in Savtira, despite knowing of Savtira's defaults on the July 4 Note and its payroll obligations.

75.     On April 3, 2012, Constantinou and Taylor called the inexperienced investor to discuss her potential purchase of Savtira stock.  On this call, Taylor confirmed Constantinou's

misrepresentations and omissions by congratulating the inexperienced investor and telling her that she was about to be a millionaire.

76.     Based on Constantinou's representations and written materials he sent, the inexperienced investor purchased Savtira stock.  On or around April 4, 2012, she wired $50,000 to Savtira.  She was issued 200 shares of Savtira stock on the same day.

77.     On April 5, 2012—the day after the photographer and the inexperienced investor purchased Savtira stock—Savtira wired $5,000 to Constantinou.

78.     Savtira's bankruptcy petition was filed less than one month after these unaccredited, unsophisticated investors purchased Savtira stock.

### CLAIMS FOR RELIEF

### COUNT I

**Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)
(Against All Defendants)**

79.     The Commission repeats and realleges paragraphs 1 through 78 of this Complaint as if fully restated herein.

80.     Roberts and Taylor, from no later than June 2011 until at least April 2012, and Constantinou, from no later than September 2011 until at least April 2012, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

81.     By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

## COUNT II

### Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Against All Defendants)

82.     The Commission repeats and realleges paragraphs 1 through 78 of this Complaint as if fully restated herein.

83.     Roberts and Taylor, from no later than June 2011 until at least April 2012, and Constantinou, from no later than September 2011 until at least April 2012, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84.     By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## COUNT III

### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act
### (Against All Defendants)

85.     The Commission repeats and realleges paragraphs 1 through 78 of this Complaint as if fully restated herein.

86.     Roberts and Taylor, from no later than June 2011 until at least April 2012, and Constantinou, from no later than September 2011 until at least April 2012, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly engaged in acts, practices and courses of business which operated as a fraud upon the purchasers of such securities.

87.     By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

## COUNT IV

### Fraud in the Offer or Sale of Securities in Violation of
### Section 17(a)(1) of the Securities Act
### (Against All Defendants)

88.     The Commission repeats and realleges paragraphs 1 through 78 of this Complaint as if fully restated herein.

89.     Roberts and Taylor, from no later than June 2011 until at least April 2012, and Constantinou, from no later than September 2011 until at least April 2012, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

90.     By reason of the foregoing, the Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT V

### Fraud in the Offer or Sale of Securities in Violation of
### Section 17(a)(2) of the Securities Act
### (Against All Defendants)

91.     The Commission repeats and realleges Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

92.     Roberts and Taylor, from no later than June 2011 until at least April 2012, and Constantinou, from no later than September 2011 until at least April 2012, directly and

indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

93.    By reason of the foregoing, the Defendants directly and indirectly violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT VI

### Fraud in the Offer or Sale of Securities in Violation of
### Section 17(a)(3) of the Securities Act
### (Against All Defendants)

94.    The Commission repeats and realleges Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

95.    Roberts and Taylor, from no later than June 2011 until at least April 2012, and Constantinou, from no later than September 2011 until at least April, the Defendants, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon purchasers and prospective purchasers of such securities.

96.    By reason of the foregoing, the Defendants directly and indirectly violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT VII

### Sales of Unregistered Securities in Violation of
### Sections 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

97.   The Commission repeats and realleges paragraphs 1 through 78 of this Complaint as if fully restated herein.

98.   No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described in this Complaint, and no exemption from registration exists with respect to these securities and transactions.

99.   Starting no later than November 2010, the Defendants, directly and indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise; (b) carried securities or causing such securities to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, without a registration statement having been filed or being in effect with the Commission as to such securities.

100.   By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT VIII

### Control Person Liability Under
### Section 20(a) of the Exchange Act
### (Solely Against Defendant Roberts)

101.   The Commission repeats and realleges paragraphs 1 through 78 of this Complaint as if fully restated herein.

102.   At all relevant times, Roberts possessed, directly or indirectly, the power to direct and control Savtira's management, policies, and operations and was a control person of Savtira pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].   Roberts was a culpable participant in Savtira's violations of the Exchange Act as described above.

103.   By reason of the foregoing, Roberts is jointly and severally liable as a control person of Savtira with, and to the same extent as, Savtira for Savtira's violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(c)(1)(A)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and unless enjoined and restrained, Roberts will continue to cause, or will fail to prevent, Savtira's violations of these provisions.

### RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that the Defendants have committed the violations of the federal securities laws alleged in this Complaint.

## II.

### Permanent Injunctive Relief

Issue Permanent Injunctions, enjoining the Defendants, their agents, servants, employees, attorneys, representatives, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## III.

### Disgorgement

Issue an Order directing the Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## IV.

### Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act, [15 U.S.C. § 78(d)].

## V.

### Officer and Director Bar

Issue an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] barring Roberts and Taylor from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## VI.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

September 9, 2015

Respectfully submitted,

By: _Christopher E. Martin_

Christopher E. Martin
Senior Trial Counsel
Arizona Bar No. 018486
Direct Dial:  (305) 982-6386
E-mail: martinc@sec.gov


Lead attorney for Plaintiff
**Securities and Exchange Commission**
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154